IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SURGICAL PROGRAM DEVELOPMENT, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:10-CV-1726-N |
| VISTA HOSPITAL OF DALLAS, LLP, | § § § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was called to trial before the Court. All parties appeared through counsel and announced ready. The case proceeded to trial. Based on the evidence at trial, the briefs, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1.      Plaintiff Surgical Program Development, Inc. ("SPD") is a California corporation with its principal place of business in California.

2.      Defendant Vista Hospital of Dallas, LLP, d/b/a Vista Hospital of Dallas ("Vista"), is a Texas limited liability partnership. Its general partner is Doctors Practice Management, Inc., a Texas corporation with its principal place of business in Texas; its limited partners are Andrew Hillman, John C. McConnell, and C.M. Schade, all of whom are Texas residents.

3.      The amount in controversy exceeds $75,000.

4.      At the pertinent times (May 2006 through April 2007) Brendan Bakir was the

president of SPD and controlled related entities in the health care field.  At the pertinent

times, Alan Beauchamp was Vista's chief operating officer ("COO").

5.      Bakir had a preexisting relationship with Dr. Wade Barker.  (To distinguish

Bakir from Barker, the Court will refer to Barker as "Dr. Barker.")  Dr. Barker performed

bariatric surgical procedures, which were intended to promote weight loss.

6.      At the pertinent times, bariatric surgery was relatively new.  Some medical

insurance carriers would not approve payment of claims for bariatric surgery, considering

it to be experimental or not medically necessary.  As a consequence, Vista offered what was

in essence a two-tier pricing structure: one price for insurance companies, where collection

was uncertain, and a substantially lower "cash" price for self-pay patients where collection

was not an issue.

7.      Vista was a stand-alone for-profit hospital.  It did not have any contractual

arrangements with any insurance carriers, HMOs, or PPOs that would provide it with

patients.  Its business model depended on individual physicians electing to use Vista's

facility for treatment of their patients.  As COO, it was Beauchamp's responsibility to grow

Vista's business, which necessitated finding ways to encourage physicians to treat their

patients in Vista's facility.

8.      Beginning some time before May 24, 2006, *see* Defendant's Exhibit ("DX")

22, Bakir and Beachamp began exploring possible business arrangements.  Initially, they

discussed an arrangement that would require the consent of Merrill Lynch Capital, which had

a security interest in Vista's accounts receivable.  *See* DX-18.  Apparently approval from Merrill Lynch was not forthcoming and the parties looked for "another solution to skin the cat."  DX-26.  One other option discussed involved Vista leasing its operating room to another SPD-related entity, which would then receive revenue for the bariatric procedures. This lease option was not acceptable to Bakir and SPD.

9.     The business arrangement that was under discussion was as follows:

a.     SPD would enter into a "factoring" agreement with Vista, pursuant to which on a patient-by-patient basis, SPD would pay Vista its self-pay charge and Vista would assign its accounts receivable to SPD;

b.     Bakir, through related entities, would find prospective patients for Dr. Barker;

c.     Dr. Barker would direct the patients to Vista for their bariatric surgery; and

d.     Dr. Barker would perform the surgery at Vista, SPD would pay Vista its self-pay rate, and Vista would assign its receivable to SPD, which would then receive whatever amounts the insurance carrier paid on the claim.

10.    The benefit to the parties was:

a.     Dr. Barker obtained patients and the revenue from performing the bariatric surgery;

b.     Vista obtained business when Dr. Barker directed the patients to Vista for the bariatric surgery and received compensation at its self-pay rate with no risk of collection from the patient's medical insurance carrier;

c.     SPD received whatever payments the insurance carrier eventually made; and

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 3

d.      SPD, unlike Vista, was not required to collect any deductible from the patient, so SPD and/or Bakir's affiliated marketing entities could offer the patient the bariatric surgery with no out of pocket expenses as part of its marketing program.

11.   The patient's medical insurance carrier did not necessarily benefit from this arrangement.

12.      Negotiations between Vista and SPD dragged on through the summer.  As part of Bakir's marketing of Dr. Barker's services, Bakir scheduled a seminar at Vista for October 28, 2006, at which Dr. Barker would make a presentation to prospective bariatric surgery patients.  On October 11, 2006, Bakir sent an email to Dr. Barker with a copy to Beauchamp, which stated in part:

> I had not heard from Vista, I understand that Alan [Beauchamp] may have been out of town, so we are cancelling your presentation during our seminar on Saturday the 21st as it would be more frustrating for you as well as the patient if you see them, and our contract with the facility that you chose is not in place.

DX-28.  This was a not-so-subtle warning to Vista and Beauchamp that SPD had the ability to deliver Dr. Barker's patients to Vista, but would not do so unless the "factoring" agreement were in place.

13.      Bakir's email had the desired effect.  Two days later, on October 13, 2006, Beauchamp replied, saying:

> Brendan [Bakir],
> WE'RE IN!!!
> Give me a call on my cell . . . so I can go over the particulars.
> Alan [Beauchamp]

DX-28.  Shortly thereafter, Vista and SPD entered into a "factoring" agreement, with the effective date of November 1, 2006.  DX-1 (the "Contract").  (The actual date SPD and Vista signed the Contract is unclear.)

14.     Dr. Barker shortly thereafter performed four bariatric surgeries at Vista.  *See* DX-6 to 9 (assignments of receivables).  Three of the patients' insurance companies paid for the surgeries and the fourth did not.  Beauchamp and Vista almost immediately experienced buyer's remorse.  Beauchamp suggested retrading the deal and a 50-50 split of proceeds.  *See* DX-35.  After some stalling, Beauchamp terminated their arrangement.  *See* DX-41.  Vista also never paid SPD the amounts it was due under the Contract and the assignments for the four surgeries, approximately $153,160.

15.     Bakir at some times maintained that SPD was not involved in the advertising side of the plan.  *See* DX-35 ("In theory, and in contract, we do not do the marketing.  The surgeons we use contract with a third party company that charges in excess of $120,000 per month to do management and marketing.  SPD can only recommend certain entities, but SPD is not in the business of marketing.").  In fact, SPD's "factoring" was inextricably tied to marketing.  For example, SPD finally got Vista to sign the Contract by threatening to cancel a marketing seminar for prospective patients.  *See* DX-28.  Bakir also directly tied receipt of funds for the surgeries to Dr. Barker's advertising.  *See* DX-32 ("The issue is that my accounting department calls to find out the amount authorized, and we assign Dr. Barker's advertising accordingly.  February's advertising is not going to start until the 12th because we missed the deadline."); DX-42 ("I remain steadfast in my support for Dr. Barker, and my

promise to market his practice, I am waiting on that check to be able to do that."). *See also* DX-38 ("We are asking the company responsible for Dr. Barker's ads to reactivate the $30,000 + marketing for Dr. Barker, which in the past had generated up to 8 eligible patients per month."); DX-40 ("Dr. Barker's new advertising campaign is set for May as well."). Marketing Dr. Barker was an integral part of SPD's business model, though sometimes performed by other Bakir-controlled entities. *See* DX-38 ("We will hire an Internet firm, possibly my own BCC Internet . . . to develop a site consistent with the top spine sites that we have developed.") (referring to similar plan to develop spine surgery program with Vista).

16.    Bakir represented that he, on behalf of SPD, could influence which hospital Dr. Barker used for his procedures. *See* DX-26 ("I [Bakir] have been willing to have Dr. Barker redirect our cases to Vista based on his surgery schedule alone and obviously, now I would like our cases to be done at facilities that we contract with, its [*sic*] only fair.") (during earlier June negotiations); DX-28 (tying marketing seminar with Dr. Barker's choice of facilities); DX-35 ("[W]e took cases away from [another doctor] and gave to Barker to do at Vista, we also took cases away from one hospital and one surgery center and brought to Vista, I also instructed Dana [Dr. Barker's office manager] to hold off on scheduling any more until we make sure that this arrangement is OK going forward."); DX-36 ("We have 11 patients in the pipeline, and 23 more that we have not forwarded to Dr. Barker yet."); DX-37 ("Dr. Barker lobbied for Vista like no doctor should....... I had canceled his cases for 4 months when we could not get your corporate people to look at the deal the first time around. . . .  I have reassigned Dr. Barkers's cases and have now been given to another doctor . . . .") DX-39 ("I

also had a conversation with Dr. Barker.  He is eager to start bringing our cases there, but he is much more eager for our advertising to start at full swing again."); DX-42 ("I will instruct Dana [Dr. Barker's office manager] not to send any of the contracted medical group's cases to Vista . . . .").

17.     SPD in fact could control which facility Dr. Barker chose to use for surgery on the patients he obtained through the marketing efforts of SPD's affiliates.  The reason Vista entered into the Contract with SPD was to obtain Dr. Barker's patients.  *See* DX-44 ("You [Beauchamp] said that if I [Bakir] could get Dr. Barker to do more cases at Vista, but not Horrellino, then you will match any deal.").  In fact, that was the result.  *See id.* ("Eight months later, when I [Bakir] had 4 patients that were going to be financed by SPD at a different facility, you signed the contract and an assignment letter for each patient.").

18.     The Contract does not make economic sense as a standalone factoring agreement.  "In the factoring process, a business sells its accounts receivables to a finance company at a discount.  Then, as the business collects its receivables, it repays the factor. (In some cases, clients pay the factor directly.)" *Staff It, Inc. v. United States*, 482 F.3d 792, 794 (5th Cir. 2007).  Under the Contract, Vista agreed to assign its complete receivable to SPD, around $60,000 per patient, in exchange for a cash payment by SPD of $7,000 per outpatient laparoscopic bariatric procedure and $9,000 per inpatient bariatric procedure.  *See* DX-1 Attachment B.  This is substantially less than Vista would have received in any normal, arm's length factoring agreement.  The payments to SPD (the receivable paid by the

insurance company less the self-pay cash price paid by SPD to Vista) far exceed the fair market value of any factoring services SPD provided.

19.    Vista did not in the normal course of its business factor its accounts receivable. Vista had no economic need to factor its accounts receivable.  Vista had sufficient cash flow without factoring its accounts receivable.

20.    Here the discount in the Contract was not based on the time value of money or the risk of collection, but rather on Vista's self-pay cash price.  As Bakir told Beauchamp, "your invitation was that you would take that amount all day, any day. . . .  The business model is unique as it calls for SPD to potentially make $240,000 while paying a usual and customary price.  It is a carve-out if you will."  DX-35.  The economic reality of the arrangement is that Vista agreed to pay SPD all insurance proceeds in excess of its self-pay cash price in exchange for SPD delivering patients to Vista.  Under the Contract, Vista and SPD agreed that Vista would pay SPD for patients.

21.    Any of the foregoing findings of fact that are more properly viewed as conclusions of law are also adopted by the Court as conclusions of law.

## II. CONCLUSIONS OF LAW

1.    SPD and Vista are citizens of different states and the amount in controversy exceeds $75,000.  The Court has jurisdiction over the parties and subject matter of this dispute.  28 U.S.C. § 1332.

2.    As the Fifth Circuit recently explained:

The general rule under Texas law is that "no accounting or recovery of profits can be had by one party to an illegal transaction against another."

*Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 150 (1947) (quotations omitted); *see also Beer v. Landman*, 88 Tex. 450, 31 S.W. 805, 806 (1895) ("[N]either a court of law nor a court of equity will aid either [party to an illegal transaction] to recover or reinvest himself with any title or interest which he, in consideration of such unlawful contract, has vested in the other, but will leave them in the same condition as to vested interests as they, by their own acts, have placed themselves."). This rule springs from a judicial "unwillingness to afford the matter an initial examination [which] flows from the failure of the illegal contract to confer upon the parties rights to be examined and determined by a court . . . and from a refusal to aid a plaintiff who stands in pari delicto with the defendant." *Burks v. State*, 795 S.W.2d 913, 914 (Tex. App. – Amarillo 1990, pet. ref'd) (citing *Ewell v. Daggs*, 108 U.S. 143, 147-50, 2 S. Ct. 408, 27 L. Ed. 682 (1883)).

*Packard v. OCA, Inc.*, 624 F.3d 726, 730 (5th Cir. 2010).

3.      In the underlying OCA bankruptcy case, which held that OCA's contractual arrangement resulted in the illegal corporate practice of dentistry under the Texas Occupation Code, the Fifth Circuit observed:

> Under Texas law, a contract is illegal, and thus void, if the contract obligates the parties to perform an action that is forbidden by the law of the place where the action is to occur. *Miller v. Long-Bell Lumber Co.*, 148 Tex. 160, 222 S.W.2d 244, 246 (1949). Contracts are presumptively legal, so the party challenging the contract carries the burden of proving illegality. *Franklin v. Jackson*, 847 S.W.2d 306, 310 (Tex. App. – El Paso 1992, writ denied). "When two constructions of a contract are possible, preference will be given to that which does not result in violation of law." *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 149 (1947).

*In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008).

4.      The Texas Occupations Code provides:

> A person commits an offense if the person knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 9

TEX. OCC. CODE § 102.001(a).

Section 102.001 permits any payment, business arrangement, or payment practice permitted by 42 U.S.C. Section 1320a-7b(b) or any regulation adopted under that law.

*Id.* § 102.003.  The burden of proving any safe harbor under 42 U.S.C. § 1320a-7b(b) or

regulation adopted under that section is on SPD.

5.     42 U.S.C. § 1320a-7b(b) provides:

(b) Illegal remunerations
(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 10

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3) Paragraphs (1) and (2) shall not apply to –

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

(C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program if –

(i) the person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and

(ii) in the case of an entity that is a provider of services (as defined in section 1395x(u) of this title), the person discloses (in such form and manner as the Secretary requires) to the entity and, upon request, to the Secretary the amount received from each such vendor with respect to purchases made by or on behalf of the entity;

(D) a waiver of any coinsurance under part B of subchapter XVIII of this chapter by a Federally qualified health care center with respect to an individual who qualifies for subsidized services under a provision of the Public Health Service Act [42 U.S.C.A. § 201 et seq.];

(E) any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987 or in regulations under section 1395w-104(e)(6) of this title;

(F) any remuneration between an organization and an individual or entity providing items or services, or a combination thereof, pursuant to a written agreement between the organization and the individual or entity if the

organization is an eligible organization under section 1395mm of this title or if the written agreement, through a risk-sharing arrangement, places the individual or entity at substantial financial risk for the cost or utilization of the items or services, or a combination thereof, which the individual or entity is obligated to provide;

(G) the waiver or reduction by pharmacies (including pharmacies of the Indian Health Service, Indian tribes, tribal organizations, and urban Indian organizations) of any cost-sharing imposed under part D of subchapter XVIII of this chapter, if the conditions described in clauses (i) through (iii) of section 1320a-7a(i)(6)(A) of this title are met with respect to the waiver or reduction (except that, in the case of such a waiver or reduction on behalf of a subsidy eligible individual (as defined in section 1395w-114(a)(3) of this title), section 1320a-7a(i)(6)(A) of this title shall be applied without regard to clauses (ii) and (iii) of that section);

(H) any remuneration between a federally qualified health center (or an entity controlled by such a health center) and an MA organization pursuant to a written agreement described in section 1395w-23(a)(4) of this title;

(I) any remuneration between a health center entity described under clause (i) or (ii) of section 1396d(l)(2)(B) of this title and any individual or entity providing goods, items, services, donations, loans, or a combination thereof, to such health center entity pursuant to a contract, lease, grant, loan, or other agreement, if such agreement contributes to the ability of the health center entity to maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the health center entity; and

(J) a discount in the price of an applicable drug (as defined in paragraph (2) of section 1395w-114a(g) of this title) of a manufacturer that is furnished to an applicable beneficiary (as defined in paragraph (1) of such section) under the Medicare coverage gap discount program under section 1395w-114a of this title.

6.    42 C.F.R. § 1001.952(d) is a regulation adopted under 42 U.S.C. § 1320a-

7b(b).  It provides:

(d) Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include any payment made by a

principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met –

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

5.      Vista is a person licensed, certified, or registered by a Texas health care regulatory agency.

6.      Under the Contract, Vista knowingly agreed to pay remuneration in the form of assigning insurance accounts receivable to SPD for securing and soliciting a patient.  SPD

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 13

knowingly agreed to accept remuneration in the form of assignment of insurance accounts receivable from Vista for securing and soliciting a patient.

7.      The Contract is not a personal services or management contract. The aggregate compensation to SPD under the Contract is not consistent with fair market value in arms-length transactions. The aggregate compensation paid to SPD under the Contract is not set in advance. The services performed under the Contract involve the promotion of a business arrangement that violates Texas law. The Contract does not fall into any safe harbor in 42 C.F.R. § 1001.952(d). The Contract is not a payment, business arrangement, or payment practice permitted by 42 U.S.C. Section 1320a-7b(b) or any regulation adopted under that law. The Court would reach this same conclusion even if the burden of negating a safe harbor rested on Vista.

8.      The Contract violates Tex. Occ. Code § 102.001. The Contract is illegal.

9.      As the Fifth Circuit also noted in *Packard*:

Texas law recognizes limited exceptions to the general prohibition [of illegal contracts]. First, "[a] test, sometimes used in determining whether a demand connected with an illegal transaction can be enforced, is whether the plaintiff requires any aid from the illegal transaction to establish his case." *Lewis*, 199 S.W.2d at 151. Second, an illegal contract will not preclude recovery if the parties are not *in pari delicto*. *Graham v. Dean*, 144 Tex. 61, 188 S.W.2d 372, 373 (1945) ("The rule that a court will not entertain a suit growing out of an illegal transaction is not always applicable where the parties are not *in pari delicto*."). Finally, "even where the parties are *in pari delicto* relief will sometimes be granted if public policy demands it." *Lewis*, 199 S.W.2d at 151. In reaching that decision, the question "often involved" is "wheteher (sic) the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and the equities of the case, and the answer usually given is that which it is thought will better serve public policy." *Id.*

624 F.3d at 730.

10.     SPD cannot prove its case independently of the Contract, given that it seeks relief for breach of the Contract.

11.     "*In pari delicto*" means equally at fault.  BLACK'S LAW DICTIONARY 862 (9th ed. 2009).  Parties are not *in pari delicto* "where the illegality of the transaction depended on the existence of peculiar facts which were known to the defendant but unknown to plaintiff, and plaintiff had no intention of violating the law."  *Graham v. Dean*, 188 S.W.2d 372, 373 (Tex. 1945) (citing 17 C.J.S., Contracts § 291 at 679; 13 C.J. 517; 12 Am. Jur. 648; 10 Tex. Jur. 195).  There were no peculiar facts known to Vista but unknown to SPD that rendered the Contract illegal.  Vista and SPD are *in pari delicto*.

12.     Finally, no public policy here supports the Court lending its aid to a party to an illegal contract.

13.     Vista has established by a preponderance of the evidence its affirmative defense that the Contract is illegal and therefore unenforceable.

14.     SPD is not entitled to recover from Vista on SPD's breach of contract claim.

15.     The Court does not permit Vista a trial amendment to assert a declaratory judgment counterclaim that the Contract is illegal and unenforceable simply so Vista can assert a claim for attorneys' fees.  *See Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998) ("a party may not rely on the Texas [Declaratory Judgment Act] to authorize attorney's fees in a diversity case because the statute is not substantive law").  Even if the

Court were to consider such a request for attorneys' fees, it would exercise its discretion and deny the request given the windfall to Vista that results from the illegality of the Contract.

16.    Any of the foregoing conclusions of law that are more properly considered findings of fact are also adopted by the Court as findings of fact.

Signed March 19, 2012.

David C. Godbey
United States District Judge